UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANTHONY DEWAYNE DOYLE | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:08-CV-138-B |
| | § | (Death Penalty Case) |
| RICK THALER[1] | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Petitioner Anthony Dewayne Doyle ("Doyle") petitions the Court for an evidentiary hearing in this federal habeas proceeding.  Doyle was sentenced to death in 2004 in a Texas state court for the offense of capital murder.  After a series of unsuccessful appeals through the state courts, Doyle filed this action for federal habeas relief pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[2]  Doyle seeks an evidentiary hearing for the purpose of questioning his former trial counsel regarding his claims of ineffective assistance of counsel. For the reasons that follow, Doyle's motion for an evidentiary hearing (doc. 12) is **DENIED**.

## I.

## BACKGROUND

Doyle was tried, convicted, and sentenced to death for the 2003 robbery-murder of Hyun

---

[1]The previously-named respondent in this action was Nathaniel Quarterman. On July 15, 2009, Rick Thaler succeeded Nathaniel Quarterman as Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Under Rule 25(d) of the Federal Rules of Civil Procedure, he "is automatically substituted as a party."

[2]*Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (noting that the AEDPA applies to all habeas cases filed after April 24, 1996).

Cho when she delivered food to his home.  Doyle's conviction and sentence were affirmed on direct

appeal by the Texas Court of Criminal Appeals on May 10, 2006, in an unpublished opinion.  *See*

*Doyle v. State*, No. 74,960 (Tex. Crim. App. 2006).  The United States Supreme Court denied

Doyle's petition for writ of certiorari on October 16, 2006.  *See Doyle v. Texas*, No. 06-5788.  His

state habeas application was likewise unsuccessful. *Ex Parte Doyle*, Application No. 67,027-01 (Tex.

Crim. App. 2008).  Doyle now moves the Court to hold an evidentiary hearing to substantiate his

claims of ineffective assistance of trial counsel.

## II.

## ANALYSIS

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether

such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

would entitle the applicant to federal habeas relief" under 28 U.S.C. § 2254(d).  *Schriro v. Landrigan*,

550 U.S. 465, 474 (2007).  In making this determination, "the judge must review the answer, any

transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to

determine whether an evidentiary hearing is warranted." 28 U.S.C. § 2254, Rule 8(a).  The decision

to grant a hearing rests in the discretion of the district court, unless a hearing is barred under 28

U.S.C. § 2254(e)(2).  *See Schriro*, 550 U.S. at 468.

Doyle moves for an evidentiary hearing on each of the ineffective assistance of counsel claims

contained within his federal habeas petition, including: Ground Two - Failure to Present Fair Cross-

Section Claim; Ground Four - Failure to Object to Confession; Grounds Five and Eight - Failure to

Object to Condition of the Mind Evidence.  In deciding whether his allegations, if true, would entitle

him to federal habeas relief, the Court turns to the relevant standards for relief for claims of

ineffective assistance of counsel. The pertinent legal principle is the two-pronged standard for claims

of ineffective assistance of counsel from *Strickland v. Washington*, 466 U.S. 668, 698 (1984). The first

prong requires the habeas petitioner to show that counsel's performance was deficient in that it "fell

below an objective standard of reasonableness" so that counsel was not functioning as counsel

guaranteed by the Constitution. *Id.* at 687-688, 698. The second prong requires the defendant to

show prejudice by demonstrating that there is a reasonable probability that, but for counsel's

deficient performance, the result of the proceeding would have been different. *Id.* at 694. The Court

need not address both prongs of the *Strickland* standard if the allegations are insufficient to establish

one. *Id.* at 697.

A.      *Alleged Ineffectiveness of Counsel in Failing to Present Fair Cross-Section Claim*

        In the second ground of his petition, Doyle claims that his counsel failed to protect his right

to a fair cross section of the community which was violated by the under-representation of Hispanic

Americans on the venire. Trial counsel did not make a fair-cross-section objection. Therefore, this

Court must determine whether the fair-cross-section claim would have had merit, since it would not

be deficient to withhold a meritless objection. *See Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir.

2007); *Green v. Johnson*, 160 F.3d 1029, 1037 (1998).

        To establish a prima facie violation of the fair-cross-section requirement, a defendant must

show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that

the representation of this group in venires from which juries are selected is not fair and reasonable

in relation to the number of such persons in the community; and (3) that this underrepresentation

is due to systematic exclusion of the group in the jury selection process. *See Duren v. Missouri*, 439

U.S. 357, 364 (1979). There was no dispute that Hispanic Americans were a distinctive group in

the community, and the first element was established. (SHF #5; 4 SHR 1194.)  Doyle contends that

the state court incorrectly determined that the second and third elements were not established (SHF

##6-44; 4 SHR 1194-203), and that counsel was not deficient in failing to make that objection.

(SHF ##49-51, 54; 4 SHR 1204-5.)

Doyle argues that the second *Duren* element is established by looking to the composition of

the venire itself, and comparing the percentage of the "distinctive" group found on the venire with

the total population of the community. (Pet. at 20-2, 25-7.)  Respondent disagrees and cites a

number of Fifth Circuit opinions in support of the argument that the disparity must be determined

by looking to "the summoning process, not those who appear for service."  (Answer at 32); *United*

*States v. Butler*, 611 F.2d 1066, 1069-70 (5th Cir. 1980); *United States v. Maskeny*, 609 F.2d 183, 189-

90 (5th Cir. 1980).  Respondent also cites a number of Fifth Circuit opinions such as *United States*

*v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001), holding that the "relevant community" to establish

the second *Duren* element in that case consists "of those individuals who are eligible to serve as

jurors" and not the total population.  *See also United States v. Apodaca*, 666 F.2d 89 (5th Cir. 1982)

(affirming denial of claim where defendant presented only evidence of disparity between proportion

of target group in gross general population of those selected on jury list, and where "record is totally

devoid of any evidence that would tend to establish the percentage in either identifiable class who

are eligible to serve as jurors"); *United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981) ("to

establish the prima facie case of a denial of a fair cross-section, the disparity between the proportion

of members of an identifiable class on a jury list must be based not on total population but, instead,

on those of the identifiable class who are eligible to serve as jurors").  The Court is bound by these

precedents.

*Duren* does not guarantee that the "juries actually chosen must mirror the community" but

that they must be drawn from a source that is fairly representative of the community. *Taylor v.*

*Louisiana*, 419 U.S. 522, 538 (1975). "The fair-cross-section requirement does not guarantee 'jur[ies]

of any particular composition.' *Taylor*, 419 U.S. at 538, 95 S. Ct. 692. Rather, it only guarantees that

'the jury wheels, pools of names, panels, or venires from which juries are drawn must not

systematically exclude distinctive groups.'" *Paredes v. Quarterman*, 574 F.3d 281, 289 (5th Cir. 2009).

The Constitution assures due process in the summoning of a fair cross section of jurors, not in the

response of those properly summoned. Since Doyle's own expert admits that there was no disparity

between Hispanic Americans in the community and those summoned for jury service, this second

element is established against Doyle.[3] This also precludes the third element since there was no

underrespresentation of those summoned for jury service.

Since Doyle's allegations evince no violation of *Duren*, there could be no ineffective assistance

for failing to raise the *Duren* claim. *See Turner*, 481 F.3d at 298. Hence, no evidentiary hearing is

warranted on this claim and Doyle's motion is **DENIED** in this regard.

B.       *Alleged Ineffectiveness of Counsel in Failing to Effectively Challenge his Confession*

In the fourth ground of his petition, Doyle complains that trial counsel failed to adequately

and effectively challenge the voluntariness of Doyle's oral and written confessions. In determining

whether Doyle's allegations indicate that a valid voluntariness challenge was available to trial

---

[3]The State Court Record includes an affidavit from Harold J. Hietala, an Emeritus Professor of Anthropology and Statistical Science at Southern Methodist University, tendered by the attorney for Doyle in support of his claim. This affidavit included the assessment that "Hispanics are summoned for jury service in the same proportion as their representation in the population of people 18 years of age or older. That is, there appears to be no under-representation of Hispanics relative to the first level of under-representation." (3 SHR 986).

counsel, the Court is guided by the due process voluntariness test which Supreme Court has "refined ... into an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). "In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant." *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003) (citing *Colorado v. Connelly*, 479 U.S. 157, 163-65 (1986)).

Doyle does not identify evidence showing that his will was overborne, that there was any coercive conduct by law enforcement officials who obtained the confessions, or that any serious mental disorder existed that could have prevented him from understanding the nature of this conduct or making a voluntary confession. Instead, Doyle relies upon a statement by his attorney at the hearing on the motion to suppress that "there was never any type of inquiry as to the intellectual level of the defendant or any idea of his mental state" at the time of his confessions (31 RR 83), combined with mental evaluations that Doyle had a mild organic impairment (1 SHR 49; 2 SHR 598-600) and claims that he was "conditioned" by his prior institutional circumstances and training to confess. (37 RR 52, 176; 39 RR 22-24; Pet. at 66, 70, 74, 76.) None of this evidence rises to a level sufficient to meet the due process voluntariness test and therefore would not have constituted a valid objection. Again, the failure to make a meritless objection cannot constitute ineffective assistance. *See Turner*, 481 F.3d at 298. Once again, no evidentiary hearing is warranted on this claim and Doyle's motion is **DENIED** in this regard.

C.     *Alleged Ineffectiveness of Counsel in Failing to Investigate Mental Evidence*

In his fifth and eighth claims, Doyle complains about trial counsel's failure to investigate and present his mental health evidence. The Supreme Court has stated that in evaluating a failure to investigate, the principal concern

> is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision ... was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."

*Wiggins v. Smith*, 539 U.S. 523 (2003) (internal citations omitted) (quoting *Strickland v. Washington*, 466 U.S. at 689). Therefore, the evaluation of these claims should initially focus upon the adequacy of the investigation of these issues.

Doyle's fifth claim asserts that his trial counsel failed to adequately investigate the state-of-mind evidence and present a *mens rea* defense (alleging specifically that he failed to discover various condition-of-the-mind evidence), failed to explore scientific theories about brain development and impulse control, "failed to hire a mitigation specialist altogether, and relied exclusively on a fact investigator who did not have the specialized training that a mitigation investigator has." (1 SHR 90.) However, Doyle's attorneys obtained the services of at least two different mental health experts, one of which presented herself as a mitigation specialist. After certain difficulties with the first one, they obtained the services of Dr. Gilda Kessner, Psy.D., who stated in her affidavit for Doyle's state habeas counsel that "I am a licensed psychologist. Among other things, I do forensic psychological evaluations in capital cases for risk assessment, mitigation and mental retardation." (2 SHR 610.)

Doyle also contends that his trial counsel failed to adequately investigate and develop evidence from school records showing that he suffered from severe emotional disturbance linked to

his behavior problems.  (Pet. at 86-7.)  However, Dr. Kessner testified at trial that she investigated

these matters in preparation for opinions offered in Doyle's trial,

> Regarding his background, his mental illness, history, his family background, his
> involvement with the juvenile authorities, the treatment he received, or lack of
> treatment that he received, his behavioral problems in school and in the community
> and in the juvenile system.
>
> I've looked at all the records that pertained to those things and interviewed him and
> his family members, as well as at least one individual who treated him.

(38 RR 105.)

> I reviewed his school records, and I believe they go down – at least there is some
> narrative down at least to the third grade.

                                    * * *

> And that would include the ... ARD information admission review and dismissal
> records that are contained.  It's a review that they do and there's some psychological
> by master's level psychologist in those records.
>
> I've reviewed the Dallas County Juvenile probation records, and that would include
> the Last Chance program.  And there's brief treatment records there.  It would also
> include the psychological evaluations that Dallas County juvenile department did.
>
> The Dallas Youth Village records.  That would include any disciplinaries, the
> treatment records that were done and his discharge or unsuccessful discharge from
> those placements.
>
> And the Texas Youth Commission records, the Marlin Assessment and Orientation
> Unit, which I think has a psychological evaluation in it.
>
> And his Victory Field records, which includes daily behavior logs, group information,
> his caseworker's reports, disciplinary records, his discharge information.  And then
> there's some probation or parole records when he was on parole after TYC.
>
> I've reviewed some information from the Dallas County jail since he's been there.
> There's limited information there, and ... the typed version of this statement to the
> police.

                                    * * *

And a case report from the Rowlett Police Department dealing with the day of this immediate case.

(38 RR 117-19.)

After establishing that Dr. Kessner personally interviewed Doyle twice, Defense counsel continued to elicit her testimony as follows:

I did face-to-face interviews with his mother and his sister Lolitha, a phone interview with his sister Darranic, and a telephone interview with Dr. Carol Rogers who was treating him. She's a psychologist at Dallas County Youth Village. And she treated him over a period of a couple of months with individual psychotherapy for bereavement.

(38 RR 119-20.)  Defense counsel then examined her extensively regarding school records and psychological diagnosis and treatment, including the following discussion of whether Doyle's mental impairment was mild:

No. The information contained in his records indicates it's severe to extreme, much more than mild, much more than moderate.

(38 RR 125.)  Defense counsel also asked her specifically as follows:

Q.    Did you find other records, such as this, from 1997 where they talked about an emotional disturbance that Anthony Doyle had?

A.    Yes. They were awaiting the psychological evaluations to determine if he had emotional disturbance. And they decided that he did have – he did qualify for an ED diagnosis, or plan at school, and that his behavior problems were directly linked to his mental disorder.

(38 RR 125-26.)

Defense counsel continued to examine Dr. Kessner extensively regarding these school records and other records, and the significance of these evaluations regarding federal and state guidelines and the treatment that he received, indicating that a prosecution theory of simply making bad choices does not explain Doyle's behavior.

> Because a child who has attention hyperactivity disorder or depression is not able to make the choices because they have a mental illness that needs to be treated.  And the mental illness is directly related to the behavior.  And the National Institute of Mental Health has information, that, you know, a lot of children are seen as a behavior problem and so then they don't receive treatment.
>
> And schools very often don't fully implement the types of programs that children need, as well as other information about this disorder, that there's differences in the brain with children who have attention deficit hyperactivity disorder and those who do not.  There's differences in the brain for children who receive medication and those who do not.

(38 RR 141.)

Dr. Kessner's testimony indicates that she conducted a thorough investigation for her opinions on the behavioral issues raised by the prosecution, and how they were related to his untreated mental disorders, and also the development of the frontal lobes, which continue to develop and provide impulse control into the 20s, beyond Doyle's age at the time.  Dr. Kessner also related this to Doyle's success in the structured environment of TYC and expectation of success in another one like prison.  (38 RR 150-62.)

The same sort of information presented in this habeas proceeding was made the subject of Dr. Kessner's testimony at trial.  While Doyle contends that his attorneys did not investigate mental health evidence for purposes of defending *mens rea*, the same evidence was the subject of Dr. Kessner's investigation for mitigation purposes and was fully available to trial counsel, and made the subject of extensive testimony during the punishment phase of his trial.  Therefore, these matters appear to have been adequately investigated and the information that the attorneys had in their possession fully sufficient to make an informed judgment about the strategic use of this evidence and what, if any, additional investigation was needed.  *See Wiggins*, 539 U.S. at 523-27; *Rompilla v. Beard*, 545 U.S. 374, 381-83 (2005).

One of Doyle's arguments centers on the alleged failure of trial counsel to develop and present this evidence in the guilt/innocence stage of the trial.  However, Doyle has not established that a *mens rea* defense would have been available at trial, even with the additional evidence developed after the trial.  The state court found that the proffered evidence "does not negate his intent to kill but merely shows lack of impulse control or motive.  Thus, the evidence would not have been admissible under the diminished capacity rule of *Jackson v. State*[, 160 S.W.3d 568 (Tex. Crim. App. 2005)]."  (SHF #202; 4 SHR 1233.)  This matter of state law has been determined adversely to petitioner.  Federal courts in post-conviction habeas corpus proceedings do not sit to review questions of state law.  *See Engle v. Isaac*, 456 U.S. 107, 118-121 (1982); *see also Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000) (referring to this "long-standing principle"); *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding").[4]

---

[4]Even so, the Court notes that these state habeas findings appear consistent with state law. In Texas, it is not a part of the *mens rea* element that the defendant understand the wrongfulness of his conduct at the time of the offense, or that he was operating free from any mental disease or defect so long as he was conscious at the time of the otherwise voluntary act. Section 6.03 of the Texas Penal Code defines the culpable mental states generally as follows:

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Instead, for any such mental disease or defect to constitute a defense to criminal culpability, it must satisfy the requirements of the affirmative defense of insanity.  "Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas." *Ruffin v. State*, 270 S.W.3d

Doyle also asserts that his attorneys failed to investigate and present other affirmative defenses such as sudden passion (Pet. at 97-99) or the possibility that he may have suffered from "organic brain damage and/or Bipolar disorder." (Pet. at 86.)  Doyle does not identify any evidence that shows such a diagnosis or would otherwise have supported any of these speculative defensive issues.  The State habeas court also found that the sudden passion defense was unavailable to Doyle, and alternatively that none of his evidence would have supported such a claim. (SHF ##209, 213; 4 SHR 1234-35.)  Trial counsel could not have been deficient in failing to investigate and present a defense that was not available and which could have undermined their efforts to establish a credible use of the available mental health evidence.  *See, e.g., Martinez v. Quarterman*, 481 F.3d 249, 258 (5th Cir. 2007) (holding that counsel had sufficient information to decide against pursuit of mental health evidence having mixed value in balancing other factors); *United States v. Puckett*, 505 F.3d 377, 388 (5th Cir. 2007) (affirming the denial of ineffective assistance claims without evidentiary hearing where record did not indicate the existence of any lost defenses based on diminished capacity or mental defect).

Doyle's eighth claim includes more general allegations about the punishment investigation, including allegations that the various school systems did not adequately treat his psychological problems and that defense counsel failed to investigate and present evidence that there may have been mistreatment of children in a program that Doyle's mitigation specialist directed and which Doyle had resided at one time. (Pet. at 140-42.)  However, the evidence submitted does not indicate

---

586, 593 (Tex. Crim. App. 2008) (citing *Jackson v. State*, 160 S.W.3d at 573).  At the time of this offense, section 8.01(a) of the Texas Penal Code provided that "[i]t is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."  Under Texas law, "wrong" in this context means "illegal." *Ruffin*, 270 S.W.3d at 592.

that Doyle had actually been a victim of any such mistreatment or how such evidence of mistreatment would otherwise be admissible in his trial.[5]  Instead, it presents examples of "distorting effects of hindsight" that this Court must make every effort to eliminate in order to fairly assess trial counsel's performance and to evaluate it from counsel's perspective at the time.  *Strickland*, 466 U.S. at 689.  Since trial counsel obtained the assistance of an expert who appears to be a highly experienced mitigation specialist who had extensively reviewed the mental health information, trial counsel's use of these expert evaluations appears reasonable.  Therefore, no evidentiary hearing is warranted on these claims and Doyle's motion is **DENIED** in this regard.

In each of these claims, Doyle has not made specific factual allegations which, if true, would entitle him to federal habeas relief under 28 U.S.C. § 2254(d).  *See Schriro*, 550 U.S. at 474.  Therefore, an evidentiary hearing is not warranted on any of these claims.

### III.

### CONCLUSION

For the reasons stated above, Doyle's Motion for Evidentiary Hearing on Ineffective Assistance of Trial Counsel (doc. 12) is **DENIED**.

---

[5]"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) (citing, *inter alia*, *Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985)).

SO ORDERED.

DATED: September 21, 2009

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE